**FORD, Appellant,**

v.

**FORD MOTOR CREDIT CO., Appellee.**

[Cite as *Ford v. Ford Motor Credit Co.,* 179 Ohio App.3d 83, 2008-Ohio-5672.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–08–25.

Decided Nov. 3, 2008.

84

William H. White, for appellant.

Brett K. Bacon and Timothy J. Richards, for appellee.

WILLAMOWSKI, Judge.

{¶ 1} Plaintiff-appellant, Gilbert P. Ford ("Ford"), brings this appeal from the judgment of the Court of Common Pleas of Allen County granting summary judgment on damages to defendant-appellee, Ford Motor Credit Company ("FMCC"). For the reasons set forth below, the judgment is reversed.

{¶ 2} Ford and FMCC entered into an agreement for the lease of a motor vehicle. FMCC, through its agent, contacted Ford and informed him that there had been a mistake as to some of the terms of the contract and insisted that the terms needed to be changed. Ford declined to change the terms of the contract and returned the vehicle to FMCC's agent. FMCC subsequently filed a claim against Ford in Lima Municipal Court, case No. 03 CVF 127, claiming that Ford had breached the contract and seeking damages. This complaint was voluntarily dismissed on October 3, 2007. FMCC later refiled the case, case No. 06 CVF 947, and sought damages in the amount of $13,178.36. On October 24, 2006, this case proceeded to a trial on the merits. At the conclusion of the trial, the trial court entered judgment in favor of Ford, and FMCC's case was dismissed.

{¶ 3} After FMCC lost, they failed to enter the proper code to remove the debt from Ford's file. The result was that the account was returned to collections. Subsequently, Ford received letters from collections agencies and repeated phone

calls from those agencies, and the "bad debt" was placed on his credit report by FMCC. In addition, the collection agencies placed phone calls to various family members, trying to "encourage" Ford to pay the debt. After repeated attempts to resolve the matter via phone calls and letters, Ford filed a complaint with the Court of Common Pleas of Allen County on February 12, 2007.[1] The clerk of courts sent the summons and complaint to the address provided by FMCC to the Lima Municipal Court in the complaint filed in 2006. FMCC failed to file an answer. On June 14, 2007, Ford filed a motion for default judgment. A hearing on the motion was held on July 18, 2007. On July 19, 2007, the trial court entered judgment in favor of Ford and ordered compensatory damages in the amount of $500,000 and punitive damages in the amount of $100,000. Notice of the judgment was sent to the same address as the summons.

{¶ 4} On October 9, 2007, FMCC filed a motion to vacate the default judgment. FMCC claimed that it did not receive notice of the suit and that it had a meritorious defense. The trial court on October 29, 2007, denied the motion to vacate the judgment, but granted the motion as to damages. A second damages hearing was set for December 19, 2007. On October 30, 2007, FMCC filed a motion to reschedule the hearing date, which was granted. The new hearing date was set for April 3, 2008.

{¶ 5} The parties then began engaging in discovery. On January 10, 2008, FMCC filed a motion to compel discovery. The order to compel was filed on January 14, 2008. The order to compel warned that failure to comply with discovery "shall subject [Ford] to sanctions authorized by law." On February 14, 2008, FMCC filed a motion for summary judgment. Ford failed to file an answer. The trial court granted the motion for summary judgment on March 31, 2008. Ford appeals from this judgment and raises the following assignment of error.

The trial court erred in granting [FMCC's] motion for summary judgment filed and granted without leave of the court.

{¶ 6} The first issue raised by Ford's assignment of error is that FMCC failed to seek and receive leave of court prior to filing its motion for summary judgment. "If an action has been set for pretrial or trial, a motion for summary judgment may be made only with leave of court." Civ.R. 56(A). This court has previously held that the trial court has broad discretion to allow motions after the time for their filing has passed. *Boughan v. Grange Mut. Ins. Co.*, 3d Dist. Nos.

---

1. Although the complaint did not specifically identify by name the claims upon which it was brought, a reading of it brings up claims of defamation, violations of fair debt-collection practices, and harassment, among others. Additionally, Ford claims that the acts of FMCC affected his credit, his ability to borrow money, and his ability to do business.

1–02–42 and 1–02–44, 2002-Ohio-5421, 2002 WL 31251006, ¶ 4. "Since the acceptance of the motion is by the grace of the court, the decision to accept, therefore, is itself 'by leave of court.'" Id., quoting *Cochran v. Ohio Auto Club* (Oct. 3, 1996), Marion App. No. 9–96–33, 1996 WL 562055. Here, the trial court's acceptance of the motion did not prejudice Ford. Ford had ample time to respond to the motion, but failed to do so. Since Ford was not prejudiced by the acceptance, the acceptance of the motion is not error.

■ {¶ 7} Having found that the motion was properly before the trial court, the next question is whether the trial court properly granted summary judgment. When reviewing a motion for summary judgment, courts must proceed cautiously and award summary judgment only when appropriate. *Franks v. Lima News* (1996), 109 Ohio App.3d 408, 672 N.E.2d 245. "Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issues as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party." *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189. When reviewing the judgment of the trial court, an appellate court reviews the case de novo. *Franks.*

■ {¶ 8} In this case, FMCC moved for summary judgment on the basis that Ford had not presented any evidence to support his claim for lost profits. FMCC then focuses on the fact that Ohio law requires proof of lost profits that are reasonably certain. This court has held previously that "[w]here conclusory evidence of lost profits is presented, without supporting information explaining how the profits were calculated, there is insufficient evidence of such lost profits." *Ott v. Marion Plaza, Inc.* (Aug. 31, 1987), Marion App. No. 9–85–27, 1987 WL 16265. This court continues to hold to that principle. This court notes that Ford did not properly support his claim of lost profits at the first damages hearing.[2]

{¶ 9} However, the complaint does not claim only lost profits as the damages. Ford is an individual, not a business, and he presented significant evidence of other types of damages.

[Mr. White]: * * * [S]ubsequently [to the October 2003 dismissal], now are you getting phone calls and notices and everything else?

A. Yeah, not only myself, my father-in-law, my mother-in-law, my parents, my wife, her eighty-year-old grandfather, are all getting phone calls from [FMCC]

---

2. Even if the trial court failed to properly recall the testimony from the original hearing, a copy of the transcript was available for the trial court's review as it was attached by FMCC to its motion to vacate the default judgment.

just absolutely harassing the daylights out of us. Saying they're going to fix me and they'll take care of me some way, some how, they'll get a hold of me. And you know, they want me to call them all the time. It's just a constant harassment. They were really being extremely nasty to my wife's grandpa which was a little uncalled for considering he's eighty years old.

Q. So the [2006 case] is dismissed.

A. The case is dismissed.

Q. Now, what happens?

A. So, nothing—but two weeks to the date I start getting harassing phone calls. * * * The first time they called me, I answered. Didn't know who it was. It says no caller I.D. every time they call me. And he said, "Hey, you know you owe us money." And I said, "Who is this?" I said, "I don't owe anybody any money. I'm debt free. So, I don't know what you're talking about." And he said, he goes, "This is—we're representing [FMCC]." And I said, "I won this case in a court of law, you know, two weeks ago." And he said, "Oh, no, you didn't, you son of a bitch." You know? And he goes, "we'll fix your ass. You'll see. We're going to be taking you to court again." * * *

So, my wife's grandpa calls me and he goes, "I just got a really, really nasty phone call." He goes, "What's going on Here?" He goes, "I know your integrity and stuff like that, you know. What's happened here?" * * * And so they're calling him and harassing him on a daily basis. * * *

Q. Let me ask you, Mr. Ford, as far as your credit report. Is this—has this gone on your credit report?

A. It has [gone] on my credit report as an involuntary repossession.

Q. When did that first go on your credit report?

A. That went on approximately the first time we went to court.

Q. Okay, and it hasn't been removed since that—

A. I've tried and tried and tried.

The Court: Involuntary—what'd they call it?

Mr. Ford: Involuntary repossession. That basically states that they came to my house with a tow truck, like you see on T.V., and they came and got the vehicle.

Q. And what else does it reflect? * * *

A. That's it, I mean, from Ford. I mean, my credit report is clean. * * *

Q. Okay, does that continue to be on your credit report?

A. Absolutely.

Q. * * * Okay, let's talk about how you've been hurt. Now, first of all, there's an exhibit in there that you are reported to have signed. It's your testimony that you did not sign that.

[Ford]: I did not sign that document.

Q. And Judge Lauber more or less found that to be the case.

A. Yeah, they forged my document so they could get their numbers where they needed to be, what they told me that my car payment was going to be. I told them that I wanted a twenty-four (24) month lease, fifteen thousand (15,000) a year, and that I wanted to pay three hundred dollars ($300). That statement says that I'm going to—it's like a forty-eight (48) month or thirty-six (36) month, I'm not quite sure. It's been a while since—

Q. So they've—

A. —It's—It's a completely bizarre—

Q. They used a forgery and the judge didn't buy it and he dismissed their case at this time with prejudice.

A. Yeah.

Q. This was the second filing anyway. So you did get a judgment.

A. This was the second one. So, he—he basically blew up in court. He just had had enough of seeing the documents and everything. He had had enough of it.

The Court: That was in October of last year.

Mr. White: Yes, sir. Okay, so they used forgery. They said that they got a judgment against you that they haven't had. You're constantly being harassed and so forth. So that's why you're asking for punitive damages in the amount of a hundred thousand dollars ($100,000), is that correct?

A. Correct.

Q. All right. Now let's talk about the compensatory damages. How has this affected you in—money wise, Mr. Ford?

A. I've been unable to buy anything for the last six (6) years. The last six (6) years—I can't buy anything. A repossession on your credit report is basically like you've filed for bankruptcy. And it really, really affects your credit.

And I've tried and tried and tried and there's a point where you know that you can't get a loan, so you just quit. So, we have had to meet with banks, meet with lenders and discuss what has happened and everything has to be put under my wife's name because they won't allow me to buy anything.

I can't get a credit card, I couldn't finance a car if I tried. I can't get a house. I can't buy anything. For six (6) years. And I'm thirty (30) years old, you know. I've got responsibilities at home, two kids, a wife, you know. And it's— it gets a little old, you know?

Based upon this testimony, as well as the lost-profits testimony, the trial court originally awarded compensatory damages in the amount of $500,000. The trial court did not state that all of these damages were for lost profits, and the record indicates that other damages were present. Ford submitted a copy of his credit report from March 2007, which indicated that the only negative was FMCC's claim that he had not paid his debt. What is the value of damaged credit?

{¶ 10} Additionally, FMCC did nothing to remove the publication of the alleged debt even after it lost in court. Instead, FMCC continued to publish information that Ford still owed the money and that the debt was valid. FMCC's Recoveries Manager swore in his affidavit that as of November 14, 2006, FMCC decided to turn Ford's account over to a collections agency. This was 20 days after FMCC had lost its claim in Lima Municipal Court. The manager's affidavit states that if the debt was discharged by court order, then the wrong code was mistakenly entered into Ford's account. However, FMCC did nothing to rectify the situation. What is the value of Ford's reputation? This question as well as the one posed above is not an objective determination. They are subjective questions of fact that must be resolved by a jury. Thus, they are material issues of fact present in this case that make the granting of summary judgment improper. The trial court erred in granting summary judgment. The first assignment of error is sustained.

{¶ 11} The judgment of the Court of Common Pleas of Allen County is reversed, and the matter is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

SHAW, P.J., and PRESTON, J., concur.